IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

HEITECH SERVICES, INC.        )
                                          )

             Plaintiff,         )
                                          )

v.                        )     **Case No. 1:14-cv-00739-JCC-TCB**
                                          )     **PROVISIONALLY FILED**
**FRONT ROWE, INC., *et al.***       )     **UNDER SEAL**
                                          )

             Defendants     )
_____ )

### HEITECH SERVICES, INC.'S CORRECTED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

HeiTech Services, Inc. ("HeiTech"), pursuant to Fed. R. Civ. P. 56, respectfully moves

for summary judgment against Defendants Front Rowe, Inc. ("FRI"), Karen Rowe, and Atron

Rowe, and in support submits as follows:

## I.    INTRODUCTION

This litigation arises out of a subcontract between FRI (as prime contractor) and HeiTech

(as subcontractor), pursuant to which the parties were to work together to perform scanning and

digitization work for the United States Department of Labor ("DOL"). Under FRI's prime

contract with DOL, FRI was paid by DOL based on pages of production output. Under the

subcontract between FRI and HeiTech, prime contract revenues were be split on a 51% / 49%

basis, with 49% of the revenues being paid to HeiTech.

During the course of subcontract performance, HeiTech based its invoicing on production

output reports that were provided by FRI. After performing under the subcontract for

approximately twenty months, however, HeiTech learned that FRI's principals, Karen Rowe and

Atron Rowe had been misrepresenting production outputs to HeiTech. In their reporting and

billing to DOL, FRI, Karen Rowe and Atron Rowe would report actual production outputs, but in

their reporting to HeiTech (upon which HeiTech based its invoicing to FRI), significantly lower levels of production output were reported. By misrepresenting and concealing actual production outputs, FRI concealed amounts that were actually owed to HeiTech.

Unfortunately, the under-reporting production outputs was but one of the misrepresentations and concealments perpetrated by FRI, Karen Rowe and Atron Rowe. FRI also failed to make any payments at all on seven different invoices submitted by HeiTech. When asked why payments had not been made to HeiTech, FRI and its principals advised that payment had not been made to FRI by DOL. In fact, FRI had been paid by DOL and these representations were patently false.

By misrepresenting and concealing production outputs, and by misrepresenting and concealing payment status from DOL, FRI and its principals induced HeiTech to continue performing under the subcontract, while, unbeknownst to HeiTech, monies that were due and owing to HeiTech continued to paid to FRI by DOL, only to be funneled out of the company to pay various personal expenses of Karen and Atron Rowe.

As set forth in greater detail below, there are no material facts in dispute with respect to the contractual breaches and misrepresentations of FRI, Karen Rowe and Atron Rowe and, accordingly, HeiTech is entitled to judgment as a matter of law.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      HeiTech is a Maryland corporation with its principal place of business in Maryland. See Statement of Uncontested Facts, Docket No. 26 (hereinafter "SUF") ¶ 1; Complaint, Docket No. 1 (hereinafter "Compl.") ¶ 1.

2.      FRI is a Virginia corporation with its principal place of business in Virginia. See SUF ¶ 2; Answer, Docket No. 9 (hereinafter "Answer") ¶ 2.

2

3.      Atron Rowe is a resident of Virginia.  See SUF ¶ 3; Answer ¶ 3.

4.      Karen Rowe is a resident of Virginia.  See SUF ¶ 4; Answer ¶ 4.

5.      From 1997 through the present, Atron Rowe and Karen Rowe owns and operates FRI.  See SUF ¶ 5; Answer ¶ 8.

6.      From 1997 through the present, Karen Rowe is the President/CEO of FRI.  See SUF ¶ 6; Answer ¶ 4.

7.      From 1997 through the present, Atron Rowe is the Vice President, Treasurer, and Chief Financial Officer of FRI.  See SUF ¶ 7; Answer ¶ 3; see also Exhibit ("Exh.") 1, Deposition of Atron Rowe ("A. Rowe Dep.") at 12:10-17.

8.      On May 1, 2012, FRI entered into Contract Number DOLJ121A21854 (the "Prime Contract") with the United States Department of Labor ("DOL").  See SUF ¶ 8; Exh. 2, Contract No. DOLJ121A21854.

9.      Under the Prime Contract, DOL agreed to pay FRI for certain document preparation work at the prices per page as set out in the Prime Contract, based on an apportioned rate of 49% of FRI's price per page but for the same number of pages as those reported by FRI. See SUF ¶ 9; Exh. 2, Contract No. DOLJ121A21854 § B.1.1.

10.     The basis for the estimate for the price/page to the Government during proposal preparation was a combination of fixed cost and variable cost to be absorbed by each partner based upon the workload volumes.  In the preparation of the fixed price/page provided to the Government, each partner committed to fixed costs in line with a 51%/49% revenue split between FRI and HeiTech.  Therefore, for each partner to recover their fixed costs, it was critical that the workload volumes be realized based upon the Government's workload projections cited

3

in the request for proposal. Although FRI realized the workload volumes in the contract, HeiTech did not. See Exh. 5, Declaration of Heidi W. Gerding ("Gerding Decl.") ¶ 8.

11.     Under the Prime Contract, the revenue that FRI received from DOL was based on the number of pages scanned and digitized. See Exh. 2, Contract No. DOLJ121A21854 § B.1.1.

12.     On July 1, 2012, FRI and HeiTech entered into a Subcontractor Agreement ("Subcontract") as a result of DOL's award of the Prime Contract to FRI. See SUF ¶ 10; Exh. 3, Subcontractor Agreement.

13.     Under the Subcontract, the revenue was to be apportioned in accordance with the previously agreed-upon 51/49 split to FRI and HeiTech, respectively, based on the production output FRI charged to DOL and in order for each partner to recover its fixed costs used to price this contract. See Exh. 3, Subcontractor Agreement § C.04; see also Exh. 5, Gerding Decl. ¶ 8.

14.     Under the Subcontract, FRI agreed to pay HeiTech 49% of the revenue it received from DOL for all work charged on the Prime Contract because it was the only way that HeiTech could recoup their fixed costs. Id. §§ A.06, C.04; see also Exh. 4, Deposition of Karen Rowe ("K. Rowe Dep.") at 37:4-21, 128:3-13; Exh. 1, A. Rowe Dep. at 69:14-70:12, 78:8-18; Exh. 5, Gerding Decl. ¶ 8.

15.     Under the Subcontract, FRI agreed to pay HeiTech by no later than five working days after payment for said invoices was received by FRI from DOL. See Exh. 3, Subcontractor Agreement § C.06.

16.     Under the Subcontract, HeiTech employees worked directly with FRI employees to complete the work and were managed by FRI employees. See Exh. 5, Gerding Decl. ¶ 6.

17.     For the months of July 2012 through May 2014, Karen Rowe submitted, on behalf of FRI, invoices to DOL for work under the Prime Contract. See Exh. 4, K. Rowe Dep. at 50:11-16, 83:17-84:6; see also Exhs. 6-32, FRI's invoices to DOL.

18.     For the months of July 2012 through May 2014, each monthly invoice that Karen Rowe submitted to DOL was based on the number of pages processed and billed under the Prime Contract rates during that month. See Exh. 4, K. Rowe Dep. at 83:17-85:6, 113:22-114:11; see also Exhs. 6-32, FRI's invoices to DOL.

19.     For the months of July 2012 through May 2014, Karen Rowe submitted Monthly Status Reports along with the invoices it submitted to DOL. Each Monthly Status Report contained the total production output for the previous month's workload volumes. See Exh. 4, K. Rowe Dep. at 50:17-19, 83:17-84:18; see also Exhs. 33-56, FRI's Monthly Status Reports.

20.     At the request of HeiTech, for the months of July 2012 through March 2014, Karen Rowe sent to HeiTech, by email on a monthly basis, the purported production output during the preceding month. See Exh. 5, Gerding Decl. ¶ 7; see also Exh. 4, K. Rowe Dep. at 85:10-86:4; see also Exhs. 57-77, FRI's emails to HeiTech.

21.     For the months of July 2012 through March 2014, on a monthly basis, HeiTech reasonably relied on the production output during the preceding month that was provided by Karen Rowe when it prepared an invoice to FRI. See Exh. 5, Gerding Decl. ¶ 9; see also Exh. 4, K. Rowe Dep. at 89:6-90:3.

22.     For the months of July 2012 through March 2014, when Karen Rowe sent to HeiTech the purported production output during the preceding month, she did not send to HeiTech the Monthly Status Report or the invoice that FRI submitted to DOL. See Exh. 5,

Gerding Decl. ¶ 10; see also Exh. 4, K. Rowe Dep. at 125:5-126:2; Exhs. 57-77, FRI's emails to HeiTech.

23.     For the months of July 2012 through March 2014, when Karen Rowe sent to HeiTech the purported production output during the preceding month, she knew that for at least 16 of these months, the production output given to HeiTech was not the same as the production output FRI charged to DOL under the Prime Contract rates. See Exh. 4, K. Rowe Dep. at 105:20-107:8, 121:4-122:2. See also the production outputs FRI reported to DOL and to HeiTech in Table A, below:

| TABLE A | | |
|---|---|---|
| **Period** | **Output Reported by FRI to DOL** | **Output Reported by FRI to HeiTech** |
| July-12 | Inventory 454 boxes (See Exh. 6) | 0 (See Exh. 57) |
| Aug-12 | 158,404 (See Exh. 7) | 158,404 (See Exh. 58) |
| Sep-12 | 150,000 (See Exh. 8) | 57,401 (See Exh. 59) |
| Oct-12 | 156,859 (See Exhs. 9, 10) | 59,233 (See Exh. 60) |
| Nov-12 | 199,375 (See Exhs. 11, 13) | 65,372 (See Exh. 61) |
| Dec-12 | 193,543 (See Exh. 12) | 42,090 (See Exh. 62) |
| Jan-13 | 146,789 (See Exh. 14) | 58,653 (See Exh. 63) |
| Feb-13 | 186,789 (See Exh. 15) | 84,320 (See Exh. 64) |
| Mar-13 | 477,425 (See Exh. 16, 17) | 165,002 (See Exh. 65) |
| Apr-13 | 520,949 (See Exh. 18) | 130,046 (See Exh. 66) |
| May-13 | 428,942 (See Exh. 19) | 143,287 (See Exh. 67) |
| Jun-13 | 312,566 (See Exh. 20) | 156,283 (See Exh. 68) |
| Jul-13 | 147,770 (See Exh. 21) | 147,770 (See Exh. 69) |
| Aug-13 | 78,474 (See Exh. 22) | 121,349 (See Exh. 70) |
| Sep-13 | 122,475 (See Exh. 23, 24) | 107,608 (See Exh. 71) |
| Oct-13 | 108,195 (See Exh. 25) | 10,8195 (See Exh. 72) |
| Nov-13 | 180,555 (See Exh. 26) | 85,434 (See Exh. 73) |
| Dec-13 | 191,024 (See Exh. 27) | 40,705 (See Exh. 74) |
| Jan-14 | 198,885 (See Exh. 28) | 131,116 (See Exh. 75) |
| Feb-14 | 244,238 (See Exh. 29) | 145,121 (See Exh. 76) |
| Mar-14 | 222,984 (See Exh. 30) | 222,984 (See Exh. 77) |
| **Total:** | **4,426,241** | **2,230,373** |

24.     Karen and Atron Rowe contend in this litigation that the difference in these page counts can be explained by extra work conducted by FRI for the DOL processing pages for the

DOL's Atlanta Offices; ; however, there were no contract modifications or emails provided during discovery that substantiated the additional work that FRI was allegedly tasked to perform.. See Exh. 4, K. Rowe Dep. at 31:18-33:8, 100:5-20.

25.     Defendants have not produced in discovery any documents evidencing this work beyond the invoices and Monthly Status Reports submitted to DOL in which such work was referred to as "pages scanned" and charged under the Prime Contract scanning/digitizing rates and the additional work was never called out separately from the work that was specified to be performed under the terms of the Prime Contract. See Exh. 4, K. Rowe Dep. at 38:13-39:18.

26.     For the months of July 2012 through March 2014, Karen and Atron Rowe knew that under the Subcontract, FRI was obligated to pay HeiTech 49% of all revenue it received from DOL. See Exh. 4, K. Rowe Dep. at 37:4-21, 128:3-13; Exh. 1, A. Rowe Dep. at 69:14-70:12, 78:8-18.

27.     For the months of July 2012 through March 2014, Karen and Atron Rowe intentionally concealed from HeiTech the production output, which FRI reported on FRI's invoices to DOL. See Exh. 4, K. Rowe Dep. at 100:5-102:9, 111:4-13; see also Exh. 1, A. Rowe Dep. at 101:11-102:1; Exh. 5, Gerding Decl. ¶¶ 12, 18.

28.     For the months of July 2012 through March 2014, Karen Rowe and Atron Rowe knew that when HeiTech prepared its invoices to FRI it would rely on the production output during the preceding month that was provided by Karen Rowe via email. See Exh. 4, K. Rowe Dep. at 111:4-22, 112:14-113:3.

29.     For the months of July 2012 through March 2014, Karen Rowe and Atron Rowe intended that HeiTech would invoice FRI for the lower, inaccurate number of pages that Karen Rowe sent HeiTech via email. See Exh. 4, K. Rowe Dep. at 89:6-90:3, 111:4-22, 112:14-113:3.

30.     For the months of July 2012 through March 2014, on a monthly basis, HeiTech sent an invoice to FRI based on the purported production output during the preceding month that was provided by Karen Rowe via email. See Exh. 5, Gerding Decl. ¶ 11; see also Exhs. 78-98, HeiTech invoices to FRI.

31.     For the months of July 2012 through March 2014, FRI submitted to DOL invoices totaling $1,404,563.86. See Exh. 6-32, FRI Invoices to DOL; see also Exh. 99, FRI's Response to Plaintiff HeiTech's Interrogatory No. 1.

32.     For the months of July 2012 through March 2014, FRI received $1,404,563.86 in revenue from DOL. See Exh. 99, FRI's Response to Plaintiff HeiTech's Interrogatory No. 2.

33.     For the months of July 2012 through March 2014, HeiTech submitted to FRI invoices totaling $404,124.48 or 28.8% of the total revenue earned under the contract by FRI. See Exh. 5, Gerding Decl. ¶ 14; see also Exhs. 78-98, HeiTech invoices to FRI.

34.     Beginning in late 2013, FRI failed to make timely payments or for some months, any payments at all, to HeiTech on certain HeiTech invoices despite the Subcontract requirement to pay such invoices within five working days of FRI's receipt of payment from DOL. See Exh. 5, Gerding Decl. ¶ 15; see also Exh. 3, Subcontractor Agreement § C.05; Exh. 4, K. Rowe Dep. at 165:1-5, 173:7-174:4; Compl. ¶¶ 20-26, 38; Answer ¶¶ 20-26, 38; Exh. 1, A. Rowe Dep. at 17:21-18:3.

35.     During this time, HeiTech repeatedly asked FRI to pay these invoices and repeatedly asked FRI for the reason such invoices were not paid. See Exh. 5, Gerding Decl. ¶ 16; see also Exhs.100-104, Emails between HeiTech and Front Rowe; Exh. 1, A. Rowe Dep. at 105:12-106:5.

8

36.     During this time, Karen Rowe and Atron Rowe told HeiTech that some of FRI's payments to HeiTech were delayed because FRI had not been paid by DOL. See Exh. 1, A. Rowe Dep. at 49:12-51:4, 51:22-52:16, 106:15-107:14, 122:8-123:4.

37.     During this time, Karen Rowe and Atron Rowe knew that FRI had already received payment from DOL, more than five working days before, for the FRI invoices that they had claimed were not yet paid, but concealed that fact from HeiTech. See Exh. 1, A. Rowe Dep. at 49:12-51:4, 51:22-52:16, 106:15-107:14, 122:8-123:4; see also Exh. 4, K. Rowe Dep. at 151:20-152:3; Exhs. 100-104, 129-131, Emails between HeiTech and FRI..

38.     During this time, Karen Rowe and Atron Rowe told HeiTech that some of FRI's payments to HeiTech were delayed because FRI had not been paid by DOL in order to induce HeiTech to continue performance on the Subcontract. See Exh. 1, A. Rowe Dep. at 106:10-108:12.

39.     As of the present date, these seven invoices, totaling $166,309.62, remain unpaid by FRI. See Compl. ¶¶ 20-26, 38; Answer ¶¶ 20-26, 38; Exh. 5, Gerding Decl. ¶ 15.

40.     FRI has admitted that is obligated to pay HeiTech the amount of $166,309.62 for the seven unpaid invoices. See Compl. ¶¶ 20-26, 38; Answer ¶¶ 20-26, 38; Exh. 1, A. Rowe Dep. at 122:8-16.

41.     In addition to amounts owed for the unpaid invoices, HeiTech is also entitled to additional payments for its full 49% split on revenue received from DOL for work on the Prime Contract per the Subcontract Agreement and because it is necessary for them to recover their fixed costs used as the basis of estimate for pricing purposes. See Exh. 5, Gerding Decl. ¶ 17; see also Exh. 1, A. Rowe Dep. at 69:14-70:12, 76:8-15; Exh. 3 § C.04.

42.     Based on revenues of $1,404,563.86, if FRI had properly reported production outputs to HeiTech, HeiTech would have invoiced 49% of $1,404,563.86, i.e., the total amount of $688,236.29. See Exh. 2, Contract No. DOLJ121A21854 §§ A.06, C.04; see also Exh. 4, K. Rowe Dep. at 37:4-21, 128:3-13; Exh. 1, A. Rowe Dep. at 78:8-18, 153:9-21; Exh. 5, Gerding Decl. ¶ 19; Exh. 99, Interrogatory Response 1 (showing invoice figures). Accordingly, in addition to the $166,309.62 owed for unpaid invoices, HeiTech is also owed an additional $284,111.81 (the $688,236.29 to which HeiTech was contractually entitled less the $404,124.49 it has already invoiced). See id.

43.     FRI has admitted that it owes HeiTech an additional $284,121.74 based on its failure to accurately report Subcontract production outputs. See Compl. ¶ 40, Answer ¶ 40; see also Exh. 1, A. Rowe Dep. at 153:9-21; Exhs. 130-131, Emails from Atron Rowe to Jim Grimm.

44.     Due to FRI's failure to pay HeiTech the outstanding invoices and FRI's concealment of its invoices to DOL, the Subcontract was terminated on March 31, 2014. See Exh. 5, Gerding Decl. ¶ 25; see also Exh. 1, A. Rowe Dep. at 159:15-160:8.

45.     The Prime Contract terminated at the end of May 2014. See Exh. 1, A. Rowe Dep. at 120:3-16; see also Exh. 4, K. Rowe Dep. at 29:6-13.

46.     Because the Subcontract was terminated, HeiTech lost revenues for the months of April and May 2014 in the amount of $55,337.2. See, generally, Exh. 5, Gerding Decl. ¶ 26; see also Exhs. 31-32, FRI's Invoices 100029 and 100030.

47.     From July 2012 through April 2014, Karen Rowe and Atron Rowe received payments from FRI totaling ████████. See Exh. 105, Amount Paid through Withdrawals by FRI; see also Exh. 1, A. Rowe Dep. at 43:10-18.

48.     From July 2012 through April 2014, Karen Rowe and Atron Rowe ███████

████████████████████████████████████████      ████████████████████████.

See Exh. 1, A. Rowe Dep. at 44:3-14.

### III.    STANDARD FOR SUMMARY JUDGMENT

On a motion for summary judgment, the moving party must demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party. Rheubottom v. Washington Metro. Area Transit Auth., 521 F. App'x 177, 178 (4th Cir. 2013). Summary judgment is appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  The opposing party must do more than "simply show that there is some metaphysical doubt as to the material facts."  Matsushita Electric Indus. Co., Ltd., v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  Moreover, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### IV.    ARGUMENT

#### A.     HeiTech is Entitled to Summary Judgment on its Breach of Contract Claim

As set forth above, pursuant to the terms of the Subcontract, FRI and HeiTech were to perform scanning and digitization work for DOL.  It is undisputed that under the terms of the Subcontract, DOL was to be invoiced by FRI based on total production outputs and that the

11

Prime Contract revenues were to be split between FRI and HeiTech on a 51% -49% basis, with 49% of the revenues being paid to HeiTech in order for them to recover their fixed costs based upon the stated workload volumes in the Government's request for proposal and final contract.. See Exh. 3, Subcontractor Agreement ¶ C.04; Compl. ¶ 15; Answer ¶ 15.  Specifically, Paragraph C.04 of the Subcontract provides that "the revenue will be apportioned in accordance with the previously agreed upon 51/49 split based upon production units of output (per page rates)."  See Exh. 3, Subcontractor Agreement ¶ C.04.

As set forth below, it is undisputed that FRI breached the Subcontract by failing to pay HeiTech amounts owed.  Accordingly, HeiTech is entitled to summary judgment in the amount of $505,758.63 on its claim for breach of contract.  This amount is comprised of (i) $166,309.62 that FRI admits is owed to HeiTech for unpaid invoices; (ii) $284,111.81 that FRI admits is owed to HeiTech for under-reported production outputs; and (iii) $55,337.2 for HeiTech's lost expectancy during the Subcontract performance period that was terminated as a result of FRI's material breaches.

### 1.    Unpaid Invoices

During the course of performance, FRI periodically reported production outputs to HeiTech, and HeiTech prepared its invoices based on these reports.  See Compl. ¶¶ 16-17; Answer ¶¶ 16-17.  Specifically, between August 2012 and April 2014, FRI sent HeiTech 21 reports pursuant to which FRI advised HeiTech of the production output upon which HeiTech was to base its invoicing.  See Exhs. 57-77, Emails from FRI to HeiTech.  In total, FRI reported 2,230,373 pages of production output.  See id.  Based on these figures, HeiTech submitted invoices to FRI in the total amount of $404,124.49.  See Exhs. 78-98, HeiTech's invoices to FRI.

12

The production outputs reported by FRI and the corresponding invoice amounts submitted by

HeiTech are set forth in the Table B below:

| TABLE B | | | |
|---|---|---|---|
| **Invoice Nos.** | **Period** | **Output Reported to HeiTech by FRI** | **HeiTech's Invoice Amount** |
| N/A | July-12 | 0 (See Exh. 57) | N/A |
| 854001 | Aug-12 | 158,404 (See Exh. 58) | $21,789.92 (See Exh. 78) |
| 854002 / 854005 | Sep-12 | 57,401 (See Exh. 59) | $32,227.63 (See Exhs. 79, 82) |
| 854003 | Oct-12 | 59,233 (See Exh. 60) | $9,597.09 (See Exh. 80) |
| 854004 | Nov-12 | 65,372 (See Exh. 61) | $10,068.57 (See Exh. 81) |
| 854006 | Dec-12 | 42,090 (See Exh. 62) | $8,544.27 (See Exh. 83) |
| 854007 | Jan-13 | 58,653 (See Exh. 63) | $11,906.56 (See Exh. 84) |
| 854008 | Feb-13 | 84,320 (See Exh. 64) | $17,116.96 (See Exh. 85) |
| 854009 | Mar-13 | 165,002 (See Exh. 65) | $32,864.15 (See Exh.86) |
| 854010 | Apr-13 | 130,046 (See Exh. 66) | $26,399.34 (See Exh. 87) |
| 854011 | May-13 | 143,287 (See Exh. 67) | $29,087.26 (See Exh. 88) |
| 854012 | Jun-13 | 156,283 (See Exh. 68) | $31,725.45 (See Exh. 89) |
| 854013 | Jul-13 | 147,770 (See Exh. 69) | $29,997.31 (See Exh. 90) |
| 854014 | Aug-13 | 121,349 (See Exh. 70) | $24,633.85 (See Exh. 91) |
| 854015 | Sep-13 | 107,608 (See Exh. 71) | $21,058.21 (See Exh. 92) |
| 854016 | Oct-13 | 108,195 (See Exh. 72) | $14,757.80 (See Exh. 93) |
| 854017 | Nov-13 | 85,434 (See Exh. 73) | $11,619.02 (See Exh. 94) |
| 854018 | Dec-13 | 40,705 (See Exh. 74) | $5,535.88 (See Exh. 95) |
| 854019 | Jan-14 | 131,116 (See Exh. 75) | $17,884.22 (See Exh. 96) |
| 854020 | Feb-14 | 145,121 (See Exh. 76) | $19,794.50 (See Exh. 97) |
| 854021 | Mar-14 | 222,984 (See Exh. 77) | $27,516.49 (See Exh. 98) |
| | **Total:** | **2,230,373** | **$404,124.48** |

FRI has not paid HeiTech any amounts for invoices 854012, 854013, 854014, 854016,

854019, 854020, and 854021. See Compl. ¶¶ 20-26; Answer ¶¶ 20-26. These invoices total

$166,309.62. See Compl. ¶¶ 22-26, 38. FRI cannot and does not dispute that it is contractually

obligated to pay HeiTech for these invoices. To the contrary, in its Answer, FRI admits as

follows with respect to each of these invoices: "Front Rowe admits that it has not paid HeiTech

the invoiced amount. Front Rowe admits that DOL has paid Front Rowe for the full amount of

the invoice as alleged. Front Rowe has acknowledged its responsibility to pay the amount due

HeiTech based upon payment from DOL, and Front Rowe will pay that amount to HeiTech."

See Answer ¶¶ 20-26. In Paragraph 38 of its Answer, FRI further states that it "admits that it owes the amounts stated in paragraph 38 [i.e., $166,309.62]." See Compl. ¶ 38; Answer ¶ 38. As of the present date, however, notwithstanding FRI's assertions that it will pay such amounts to HeiTech, HeiTech has received no such payments. See Exh. 5, Gerding Decl. ¶¶ 15, 24. Based on the foregoing, it is undisputed that (i) FRI had a contractual obligation to pay HeiTech the amounts set forth in these invoices; and (ii) that FRI has failed to pay such amounts to HeiTech.

Accordingly, with respect to the non-payment of invoices 854012, 854013, 854014, 854016, 854019, 854020, and 854021, there are no material facts in dispute and HeiTech is entitled to summary judgment on the portion of its breach of contract claim that seeks payment for these invoices.

### 2.    Underreporting of Production Outputs

The unpaid amounts under invoices 854012, 854013, 854014, 854016, 854019, 854020, and 854021 do not represent the only damages for which HeiTech is entitled to summary judgment on its claim for breach of contract. As set forth in Section II above, during the course of performance, FRI reported to HeiTech production output totaling 2,230,373 pages. See Exhs. 57-77, FRI's emails to HeiTech. Based on the outputs reported by FRI, HeiTech submitted invoices to FRI totaling $404,124.48. See Exhs. 78-98, HeiTech's invoices to FRI. HeiTech subsequently learned, however, that the production outputs that FRI had been reporting to HeiTech did not match what FRI was reporting and billing to DOL during the same time periods. In fact, although FRI had reported a total of only 2,230,373 pages of production output to

HeiTech, during the same period, FRI had actually invoiced DOL for 4,426,241 pages of production.[1] See Exhs. 6-30, FRI's Invoices to DOL; Exh. 99, FRI's Interrogatory Response 1.

Based on the actual production output of 4,426,241 pages, FRI invoiced DOL the total amount of $1,404,563.86 for the period July 2012 through March 2014. See id. It is further undisputed that FRI was paid this amount by DOL. See Exh. 99, Interrogatory Response 2. The production outputs reported by FRI to DOL and the corresponding amounts invoiced to and paid by DOL are set forth in the Table C below:

| TABLE C | | |
|---|---|---|
| Period | Output Reported to DOL by FRI | Amount Invoiced to DOL |
| Jul-12 | Inventory 454 boxes | $35,203.16 (See Exh. 6) |
| Aug-12 | 158,404 | $54,976.80 (See Exh. 7) |
| Sep-12 | 150,000 | $44,120.00 (See Exh. 8) |
| Oct-12 | 156,859 | $49,536.69 (See Exhs. 9, 10) |
| Nov-12 | 199,375 | $72,462.00 (See Exhs. 11, 13) |
| Dec-12 | 193,543 | $71,547.54 (See Exh. 12) |
| Jan-13 | 146,789 | $53,916.52 (See Exh. 14) |
| Feb-13 | 186,789 | $70,488.52 (See Exh. 15) |
| Mar-13 | 477,425 | $135,997.18 (See Exh. 16, 17) |
| Apr-13 | 520,949 | $154,029.17 (See Exh. 18) |
| May-13 | 428,942 | $131,360.66 (See Exh. 19) |
| Jun-13 | 312,566 | $90,210.35 (See Exh. 20) |
| Jul-13 | 147,770 | $59,484.79 (See Exh. 21) |
| Aug-13 | 78,474 | $32,511.78 (See Exh. 22) |
| Sep-13 | 122,475 | $45,486.81 (See Exhs. 23, 24) |
| Oct-13 | 108,195 | $30,121.49 (See Exh. 25) |
| Nov-13 | 180,555 | $50,266.51 (See Exh. 26) |
| Dec-13 | 191,024 | $53,181.09 (See Exh. 27) |
| Jan-14 | 198,885 | $55,369.58 (See Exh. 28) |
| Feb-14 | 244,238 | $58,127.86 (See Exh. 29) |
| Mar-14 | 222,984 | $56,165.36 (See Exh. 30) |
| Total: | 4,426,241 | $1,404,563.86 |

Accordingly, based on the contractual agreed-upon revenue split of 49%, HeiTech was entitled to invoice and receive the total amount of $688,236.29 (49% of $1,404,563.86), i.e., $284,111.81 more than the $404,124.48 that HeiTech originally invoiced based on FRI's

---

[1]    In August of 2012, FRI also invoiced DOL to "inventory 454 boxes." See Exh. 6.

underreporting of production outputs.  FRI cannot and does not dispute that it is contractually obligated to pay HeiTech the additional amount of $284,111.81.

In fact, once again, to the contrary, FRI has already admitted that such amounts are owed to HeiTech.  In Paragraph 40 of its Complaint, HeiTech alleged as follows: "[a]s a result of FRI's failure to accurately report Subcontract production outputs, HeiTech has incurred damages in the amount of $284,121.74, which is properly owed to HeiTech under the Subcontract based on actual production output."  See Compl. ¶ 40.  In its Answer, FRI responded as follows: "Front Rowe admits that it owes HeiTech the amounts stated in paragraph 40."  See Answer ¶ 40.[2]  Additionally, during their depositions both Karen and Atron Rowe conceded that they owed HeiTech 49% of the total production output billed to the DOL.  See Exh. 4, K. Rowe Dep. at 37:4-21, 128:3-8; Exh. 1, A. Rowe Dep. at 69:14-70:12; see also Exhs. 130-131, Emails from Atron Rowe to Jim Grimm.  Based on FRI's own admissions that it is obligated to pay HeiTech such additional amount, there are no material facts that can possibly be in dispute, and HeiTech is entitled to summary judgment on the portion of its breach of contract claim that seeks to recover $284,111.81 in amounts owed for underreported production outputs.

### 3.    Lost Revenues

Based on FRI's material breaches of the subcontract, i.e., its underreporting of production outputs and its failure to pay invoices 854012, 854013, 854014, 854016, 854019, 854020, and 854021, HeiTech's performance under the Subcontract was effectively terminated as of March

---

[2]    Based on HeiTech's review of the documents produced by FRI during discovery, it appears that HeiTech is actually owed $9.93 less than the amount admitted by FRI, i.e., $284,111.81 instead of $284,121.74.

31, 2014.[3] See Exh. 5, Gerding Decl. ¶ 25. During April and May of 2014, FRI invoiced and was paid by DOL the additional amount of $112,933.16. See Exh. 99, Interrogatory Responses 1 and 2; Exhs. 31-32, FRI Invoices 100029 and 100030. But for FRI's material breaches of the Subcontract, HeiTech would have continued performance during this period and would have been entitled to 49% of such revenues, i.e., $55,337.25. In order for HeiTech to recover its fixed costs associated with the original price to the Government, HeiTech needed to fulfill all the workload volumes that had been guaranteed by the Government. Such losses were undisputedly a direct and foreseeable result of FRI's material breaches of the Subcontract and, accordingly, HeiTech is entitled to summary judgment on that portion of its breach of contract claim seeking the recovery of such damages. See LaVay Corp. v. Dominion Fed. Sav. & Loan Ass'n, 830 F.2d 522, 529 (4th Cir. 1987) (stating that "[l]ost profits are, of course, generally available to a plaintiff as damages in the successful prosecution of a claim for breach of contract").

For the reasons stated above, HeiTech respectfully requests that it be awarded summary judgment on its claim for breach of contract, and that judgment against FRI be entered in the total amount of $505,758.63, together with pre- and post-judgment interest, costs and attorney's fees, and that the Court award it such other and further relief that is deemed just and proper.[4]

---

[3]     During this period, FRI continued to utilize HeiTech's scanners to perform the work on the Contract. See Exh. 5, Gerding Decl. ¶ 27. HeiTech continued to incur monthly costs of $3,897.72 for the scanner lease during this period, even though FRI continued to use and retain the scanners. See Exh. 5, Gerding Decl. ¶¶ 28-29; Exh. 106, Scanner Lease.

[4]     Pursuant to the terms of the Subcontract, HeiTech is entitled to recovery of attorney's fees from FRI. Paragraph E.05 of the Subcontract, provides that FRI will indemnify and hold harmless HeiTech "from and against all liability, loss, expense, including reasonable attorney's fees, or claims for injury or damage arising out of the performance of this Agreement . . . to the extent such liability, loss, expense, attorney's fees or claims for injury or damage are caused by or result from the negligent or intentional acts or omissions of Front Rowe, Inc., its officers, agents or employees." See Exh. 3, Subcontractor Agreement ¶ E.05. As set forth in Section IV.C infra, the damages incurred by HeiTech in this litigation result from the acts and/or omissions of FRI's officers/employees, Karen Rowe and Atron Rowe.

**B.     HeiTech is Entitled to Summary Judgment on its Fraud Claim**

In Virginia, the elements of common law fraud are: "[A] false representation of a
material fact; made intentionally, in the case of actual fraud, or negligently, in the case of
constructive fraud; reliance on that false representation to [plaintiff's] detriment; and resulting
damage." Anthony v. Verizon Virginia, Inc., 758 S.E.2d 527, 534 (Va. 2014).  To establish
fraud, "it is essential that the defrauded party demonstrates the right to reasonably rely upon the
misrepresentation." Id. (quoting Metrocall of Delaware, Inc. v. Continental Cellular Corp., 37
S.E.2d 189, 193–94 (Va. 1993)).

Virginia also recognizes fraud by omission, sometimes called "concealment."  Under
Virginia law, a concealment or omission of a material fact may also give rise to a claim of actual
fraud.  Although silence does not constitute fraud in the absence of a duty to disclose, cf. Norris
v. Mitchell, 495 S.E.2d 809, 812–13 (Va. 1998) (rejecting claim for fraud by concealment, in
part, because of holding that defendants had no duty to disclose), "[c]oncealment of a material
fact by one who knows that the other party is acting upon the assumption that the fact does not
exist constitutes actionable fraud," Allen Realty Corp. v. Holbert, 227 Va. 441, 318 S.E.2d 592,
597 (Va. 1984).

Throughout the Subcontract term, Defendants fraudulently misrepresented to HeiTech the
production totals while simultaneous providing different production totals to DOL.  Defendants
also fraudulently concealed from HeiTech that FRI was performing work on the Prime Contract
under the alleged "legacy" work although no documentation has been provided by FRI which
corroborates that there was any additional work performed as requested by the Government.
Finally, Defendants fraudulently misrepresented to HeiTech that FRI failed to pay HeiTech for
certain invoices because FRI had not been paid by DOL for those invoices.  As all of these

18

fraudulent representations are supported by the undisputed facts, HeiTech is entitled to summary judgment on its fraud claim.

**1.      Defendants     Fraudulently     Misrepresented     the Production Totals under the Prime Contract to HeiTech**

On a monthly basis from July 2012 through March 2014, the Defendants fraudulently misrepresented to HeiTech the production output totals on the Prime Contract. During this time period, HeiTech would request from FRI the production output to form the basis of its invoice to FRI. See Exh. 5, Gerding Decl. ¶¶ 7, 9; see also Exh. 4, K. Rowe Dep. at 85:10-86:4, 89:6-90:3. Under the Subcontract, FRI's payment obligations to HeiTech were "limited to the per page production output rates in the agreed upon 51/49 revenue split." See Exh. 3, Subcontractor Agreement § A.06. Therefore, the total production page number was a material fact to this Subcontract. See Anthony, 758 S.E.2d at 534 (fraud requires a "false representation of a material fact").

In response to HeiTech's requests, Karen Rowe sent via email to HeiTech a false representation regarding the page production numbers for the previous month. See Exh. 5, Gerding Decl. ¶ 18; see also Exh. 4, K. Rowe Dep. at 85:10-86:4. As Defendants admit, the production numbers that Karen Rowe sent to HeiTech often were not the same as the production numbers that Karen Rowe sent to DOL. See Exh. 4, K. Rowe Dep. at 105:20-107:8, 121:4-122:2. Moreover, at the time she sent these numbers to HeiTech, Karen Rowe knew these numbers were not the same as what FRI sent to DOL. Id.

HeiTech reasonably relied on the numbers sent by Karen Rowe in drafting its invoices to FRI. See Exh. 5, Gerding Decl. ¶ 9; see also Exh. 4, K. Rowe Dep. at 89:6-90:3, 111:4-22, 112:14-113:3. "In order to prove reliance, a plaintiff must demonstrate that its reliance upon the representation was reasonable and justified." Meridian Title Ins. Co. v. Lilly Homes, Inc., 735

19

F.Supp. 182, 185 (E.D.Va.1990) (interpreting Virginia law), aff'd, 934 F.2d 319, 1991 WL 93059 (4th Cir.1991). Under the Subcontract, FRI managed the work performed on the Prime Contract and managed any HeiTech employees working on the project. See Exh. 5, Gerding Decl. ¶ 6; see also Exh. 4, K. Rowe Dep. at 134:17-136:21. FRI sent its invoices directly to DOL and HeiTech was not involved in preparing them. See Exh. 4, K. Rowe Dep. at 50:11-16, 83:17-84:6. Therefore, because FRI was the prime contractor, had privity with DOL, and managed the work on the project, it was reasonable for HeiTech to rely on the representations of Karen Rowe, the president of FRI, regarding the total amount of work done on the Prime Contract. In fact, Karen Rowe intended HeiTech to rely on the output numbers she provided them. See Exh. 4, K. Rowe Dep. at 111:4-22, 112:14-113:3.

Finally, HeiTech's reasonable reliance on the production numbers provided by Karen Rowe clearly resulted in damages. HeiTech's monthly invoices were based on the numbers provided by Karen Rowe. See Exh. 5, Gerding Decl. ¶¶ 9, 11; see also Exh. 4, K. Rowe Dep. at 89:6-90:3, 111:4-22, 112:14-113:3. If HeiTech had been presented the higher, accurate production numbers, it would have prepared invoices based on those numbers. Id. HeiTech's damages are the difference between what it actually invoiced FRI and what it should have invoiced FRI based on what FRI invoiced DOL. Thus, HeiTech is entitled to 49% of the revenue FRI received from DOL, less the amount already invoiced by HeiTech, which is $284,111.81. See Exh. 5, Gerding Decl. ¶ 24, see also Compl. ¶ 40; Answer ¶ 40; Exh. 1, A. Rowe Dep. at 153:9-21.

Defendants' contention that they were only required under the Subcontract to send the number of pages physically scanned to HeiTech does not defeat HeiTech's fraud claim. Nor does the Subcontract Agreement between FRI and HeiTech specify that FRI is only required to

send the number of pages physically scanned to HeiTech. From September 2012 through March 2014, FRI, by Karen Rowe, sent invoices and Monthly Status Reports to DOL that contained a total number of "pages scanned." See, e.g., Exhs. 8, 35, FRI's Invoice and Monthly Status Report for September 2012. Subsequently, Karen Rowe sent emails to HeiTech that contained a total number of "pages scanned" that was different than the total number of "pages scanned" sent to DOL. See, e.g., Exh. 59, FRI's email to HeiTech for September 2012. Tellingly, Karen Rowe never sent to HeiTech the invoices or Monthly Status Reports that FRI submitted to DOL. See Exh. 5, Gerding Decl. ¶ 10; see also Exh. 4, K. Rowe Dep. at 125:5-126:2. It is undisputed that Karen Rowe knew the production output she was sending to HeiTech was different from the production output that she was sending to DOL. See, e.g., Exh. 4, K. Rowe Dep. at 105:20-107:8, 121:4-122:2. Furthermore, even if Karen Rowe erroneously believed she was sending the correct output numbers to HeiTech, her reckless disregard for FRI's requirements under the Subcontract is no defense to this claim. See Hitachi Credit Am. Corp. v. Signet Bank, 166 F.3d 614, 628 (4th Cir. 1999) ("Virginia law also recognizes an action for fraud where misrepresentations are made without specific fraudulent intent but made with reckless abandon and disregard for the truth."). Thus, it is undisputed that Defendants fraudulently misrepresented to HeiTech the output numbers, and HeiTech is entitled to summary judgment on its fraud claim.

### 2. Defendants Fraudulently Concealed from HeiTech a Portion of the Work on the Prime Contract

Defendants contend that they believed HeiTech was not entitled to revenue received for the extra work on the Prime Contract, and that is why they did not provide HeiTech with the total production outputs. See Exh. 4, K. Rowe Dep. at 31:18-33:8, 100:5-20. This contention is no defense, as Defendants intentionally concealed this work from HeiTech and had a duty to disclose it. Concealment, whether by word or conduct, may be the equivalent of a false

21

representation because it always involves deliberate nondisclosure designed to prevent another from learning the truth. See Van Deusen v. Snead, 441 S.E.2d 207, 209 (Va. 1994). Moreover, a party's willful nondisclosure of a material fact that he knows is unknown to the other party may evince an intent to practice actual fraud. Hitachi Credit Am. Corp. v. Signet Bank, 166 F.3d 614, 629 (4th Cir. 1999) (citing Van Deusen, 441 S.E.2d at 209).

Silence does not constitute fraud in the absence of a duty to disclose. Id. A duty to disclose may arise (1) if the fact is material and the one concealing has superior knowledge and knows the other is acting upon the assumption that the fact does not exist; or (2) if one party takes actions which divert the other party from making prudent investigations (e.g., by making a partial disclosure). Bank of Montreal v. Signet Bank, 193 F.3d 818, 829 (4th Cir. 1999) (citations omitted). Whether a duty exists is a pure question of law to be decided by the court based upon the circumstances of each case. See Burns v. Johnson, 250 Va. 41, 45, 458 S.E.2d 448 (1995).

As a matter of law, the Defendants owed HeiTech a duty to disclose all of the work FRI was performing under the Prime Contract. As explained above, the total production numbers and the amounts that FRI billed to DOL were material to the Subcontract. As FRI was the prime contractor and HeiTech was the subcontractor, the Defendants had superior knowledge of these amounts. See Exh. 5, Gerding Decl. ¶ 12; see also Exh. 4, K. Rowe Dep. at 125:6-126:2. To the extent FRI was performing the extra work on the Prime Contract, HeiTech was reasonably acting under the assumption that there was no extra work on the Prime Contract because it was not disclosed to HeiTech. See Exh. 5, Gerding Decl. ¶¶ 12-13; see also Exh. 4, K. Rowe Dep. at 100:5-102:9, 111:4-13; Exh. 1, A. Rowe Dep. at 101:11-102:1. The Defendants further took actions to divert HeiTech from making prudent investigations into the full extent of the work on

22

the Prime Contract, as Karen Rowe provided false representations regarding the amount of work performed on the Prime Contract. See Section IV.B.1 supra. Moreover, HeiTech repeatedly advised FRI that workload volumes were far below what HeiTech anticipated and asked FRI to discuss re-pricing the Prime Contract with DOL. See Exhs. 132-137, emails between HeiTech and Front Rowe. In response to these requests, Karen and Atron Rowe never informed HeiTech that FRI was in fact receiving the expected workload volumes. Id. Thus, it is clear that the Defendants owed HeiTech a duty to disclose the full extent of the work being performed on the Prime Contract.

As stated above, HeiTech reasonably relied on the production numbers that Karen Rowe provided to HeiTech. See Exh. 5, Gerding Decl. ¶ 9; see also Exh. 4, K. Rowe Dep. at 89:6-90:3, 111:4-22, 112:14-113:3. The Defendants intentionally concealed the extent of the extra work on the Prime Contract and only provided HeiTech with the number of pages physically scanned. See Exh. 4, K. Rowe Dep. at 71:18-72:16; 100:5-102:9, 111:4-13. Whether the purported extra work was within the scope of the Subcontract was a material issue, and the Defendants fraudulently concealed the extra work that FRI was doing from HeiTech. As explained above, had HeiTech known about the total extent of the work on the Prime Contract, it would have invoiced FRI for 49% of the amount FRI invoiced to DOL. See Exh. 5, Gerding Decl. ¶ 19. Thus, the undisputed facts, viewed in the light most favorable to Defendants, show that the Defendants fraudulently concealed from HeiTech the total amount of work performed on the Prime Contract.

### 3. Defendants Fraudulently Misrepresented the Reason for FRI's Failure to Pay Invoices to HeiTech

For a period of more than seven months, Defendants fraudulently misrepresented and concealed the status of invoices submitted to DOL in an effort to conceal FRI's breach of section

23

C.05 of the Subcontract, which requires that FRI make payment within five working days of receipt of payment from DOL. See Exh. 3, Subcontractor Agreement § C.05. Beginning in late 2013, FRI failed to make timely payments to HeiTech on certain HeiTech invoices. See Exh. 5, Gerding Decl. ¶ 15; see also Exh. 4, K. Rowe Dep. at 165:1-5 (HeiTech was not receiving payment from FRI), 173:7-174:4 (stating that FRI was not making financial payments); Answer ¶¶ 20-26 (admitting that FRI has not paid HeiTech on invoices). These invoices included more than seven months of invoices, from June 2013 through January 2014, totaling $139,327.52. See Exh. 103, email from Karen Rowe. During this time, HeiTech repeatedly asked FRI not only to pay these invoices, but also for the reason such invoices were not paid. See Exh. 5, Gerding Decl. ¶ 16; see also Exhs. 100-104, Emails between HeiTech and Front Rowe. However, during this time, Karen Rowe and Atron Rowe told HeiTech that these payments to HeiTech were delayed because FRI had not been paid by DOL. See Exh. 1, A. Rowe Dep. at 49:12-51:4 (Atron Rowe told Karen Rowe about the outstanding HeiTech invoices), 51:22-52:16 (Karen and Atron Rowe knew about the outstanding HeiTech invoices), 106:15-107:14 (Karen and Atron Rowe told HeiTech that FRI had not received payment from the DOL), 122:8-123:4 (Karen Rowe told HeiTech that FRI had not received payment from the DOL). This was a false representation and a concealment of the actual status of payment from DOL: Karen Rowe and Atron Rowe knew that FRI had already received payment from DOL on these invoices. See Exh. 1, A. Rowe Dep. at 49:12-51:4, 51:22-52:16, 106:15-107:14, 122:8-123:4; see also Exh. 4, K. Rowe Dep. at 151:20-152:3.

Under Virginia law, a plaintiff may prevail on a claim of fraud by proving "a false representation of a material fact; made intentionally, in the case of actual fraud, or negligently, in the case of constructive fraud; reliance on that false representation to [plaintiff's] detriment; and

resulting damage." Anthony, 758 S.E.2d at 534.   All of these elements are present here.  Karen
and Atron Rowe made repeated false representations to HeiTech of the material fact that these
invoices had not been paid by DOL.  These misrepresentations were made intentionally and
knowingly with full knowledge of the fact that they were not true.  See Exh. 1, A. Rowe Dep. at
49:12-51:4, 51:22-52:16, 106:15-107:14, 122:8-123:4; see also Exh. 4, K. Rowe Dep. at 151:20-
152:3.  HeiTech prudently investigated these claims by repeatedly asking FRI, Karen Rowe, and
Atron Rowe why HeiTech had not been paid, but HeiTech's investigation was thwarted by the
Defendants' false representations and active concealment of the truth.  See Exh. 5, Gerding Decl.
¶¶ 16, 21; see also Exhs. 100-104, Emails between HeiTech and Front Rowe.  Thus, HeiTech's
reliance on these claims was reasonable.  See id.  Ultimately, HeiTech was damaged as a result
of these misrepresentations because it continued performing on the Subcontract, resulting in
further damages as a result of FRI's nonpayment of invoices.  See Exh. 5, Gerding Decl. ¶¶ 24-
25.  In short, after the first HeiTech invoice went unpaid, FRI, Atron Rowe and Karen Rowe's
concealment and misrepresentation of payment status from DOL induced HeiTech to continue
performing under the subcontract.  By misrepresenting the reason for non-payment, FRI was able
obtain the continued benefits of HeiTech's performance, without paying amounts due and owing.
Moreover, as set forth in Section C, supra, this continuing fraud allowed Karen Rowe and Atron
Rowe to pay their own personal expenses from FRI's accounts, instead of turning over money
that was rightfully owed to HeiTech. FRI further continued their fraud by repeatedly reassuring
HeiTech they would renegotiate the Prime Contract pricing with DOL instead of informing
HeiTech that FRI was actually realizing the expected workload. See Exhs. 132-137, emails
between HeiTech and Front Rowe.  In fact, HeiTech did not discover the extent of FRI's deceit
until inquiring with DOL directly as to why the invoices had not been paid and why the expected

workload was never realized.  See Exh. 5, Gerding Decl. ¶¶ 18 23; see also Exh. 129, email

chain between Jim Grimm, Karen Rowe, and Atron Rowe.  As a result, HeiTech was damaged

because it delayed pursuing its legal remedies until June 2014, almost a year from the date that

FRI stopped paying invoices, based on FRI's false representation.  This delay prejudiced

HeiTech, which has suffered damages as a result of the outstanding balance and may not receive

full payment of the amounts owed to them by FRI as a result of FRI's threatened bankruptcy.

Based on the above-described fraudulent misrepresentations and concealments, FRI

incurred (in addition to the $281,111.81 for under-reported production output) damages in the

amount of $134,584.17. [5]  Accordingly, based on the misrepresentations and omissions of FRI,

Karen Rowe and Atron Rowe concerning production outputs and payment status from DOL,

HeiTech is entitled to summary judgment in the total amount of $415,695.98 on its claim for

fraud.

C.     **FRI is the Alter Ego of Karen and Atron Rowe, and HeiTech is Entitled to Pierce FRI's Corporate Veil**

Under Virginia law, a court may pierce the corporate veil to find that an individual is the

alter ego of a corporation where it finds "(i) a unity of interest and ownership between [the

individual and the corporation], and (ii) that [the individual] used the corporation to evade a

personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair

advantage."  Newport News Holdings Corp. v. Virtual City Vision, Inc., 650 F.3d 423, 434 (4th

Cir. 2011); see also McCarthy v. Giron, No. 1:13-CV-01559-GBL, 2014 WL 2696660, at *14

(E.D. Va. June 6, 2014); Dana v. 313 Freemason, 266 Va. 491, 500, 587 S.E.2d 548, 553-54

(2003) (citation omitted) (finding it appropriate to pierce the corporate veil in a corporation

formed "merely to avail [Defendants] of a shield against their potential liability for the known

---

[5] This amount represents the amounts of unpaid invoices after the first unpaid invoice.

defects"). "Virginia courts have long recognized the proposition that the corporate veil may be pierced when a shareholder has made the corporation his alter ego, and when the shareholder used the entity as a device to disguise wrongs, obscure fraud, conceal crimes, or evade personal obligations." McCarthy, 2014 WL 2696660, at *14.

The Supreme Court of Virginia has identified a number of factors used in determining the first part of the piercing the corporate veil analysis, unity of interest and control between shareholders and a corporation: 1) comingling of personal and corporate funds; 2) siphoning business assets into personal pockets; 3) undercapitalization of the business; and 4) whether business formalities were observed. Id. at *15 (citations omitted). These factors all weigh in favor of piercing the corporate veil and holding Atron and Karen Rowe personally liable for any judgment entered against FRI.

FRI is a closely held corporation and its only owners are Karen Rowe and Atron Rowe. See Exh. 4, K. Rowe Dep. at 10:7-12. Karen Rowe is the President/CEO and Atron Rowe is the Vice President, Treasurer, and Chief Financial Officer. See Answer ¶¶ 3-4; see also Exh. 1, A. Rowe Dep. at 12:10-17. To show the payments FRI received from DOL on the Prime Contract, FRI produced its bank statements but did not produce any formal corporate documents relating to or directing these payments despite HeiTech asking for such document. See Exhs. 107-127, FRI's Bank Statements; Exh. 128, First Request for Production of Documents at Request 9. To determine the amount of FRI's distributions to its sole shareholders (Karen and Atron Rowe), Atron Rowe, Treasurer of FRI, looked at the statements from Karen and Atron Rowe's personal bank account. See Exh. 1, A. Rowe Dep. at 41:18-42:8. Karen and Atron Rowe ▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇. See Exh. 1, A. Rowe Dep. at 44:3-14.

In McCarthy, this Court recently found that piercing the corporate veil was

appropriate.  First, the Court noted that

> [The] corporate bank account was used as Defendants' personal account, where
> they deposited and withdrew money, and paid personal expenses, such as
> mortgages, shopping, travel, gym membership, and car loans.  These transfers
> were made with the money paid to [the company] by Creditors, for the cost of
> renovating Creditors' property.  In addition to these financial improprieties,
> Debtor did not follow any corporate formalities.  Defendants never produced
> meeting minutes or stock books.  [One defendant] conceded in his deposition that
> he did not remember [the company] holding any meetings and that he had never
> seen any sort of corporate stock book, board of directors meeting minutes, or
> minutes of a meeting with shareholders.  [He] also conceded that [the company]
> never set up any sort of payroll account.

McCarthy, 2014 WL 2696660, at *15.

Second, considering the second part of the piercing the corporate veil analysis in

McCarthy, whether the owners used corporation to evade a personal obligation, to perpetrate

fraud or a crime, to commit an injustice, or to gain an unfair advantage, the Court looked to

determine if there was a legitimate business purpose for the conduct in question and found

none.  "Defendants have not put forth any explanation that might constitute a valid business

purpose for the transfers Trustee seeks to void nor did they testify to explain the transfers.  In the

absence of a valid business reason for their conduct, the Court may conclude that Defendants

were using the corporate form improperly.  Because the [Defendants] used [the company] for an

improper purpose, they should not be protected by the limited liability shield that is afforded by

the corporate form."  Id.

As in McCarthy, it is appropriate to pierce the corporate veil of FRI.  FRI's bank account

was used as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮  See Exh. 1, A. Rowe Dep. at 44:3-14.  From July 2012 through April 2014, Karen and

28

Atron Rowe transferred ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Id., p. 43:16-18; see also Exh. 105, Amount Paid through Withdrawals by FRI. Defendants have produced no evidence of an accounting system for these transfers.

Moreover, in Defendants' Answer, FRI, but not Karen and Atron Rowe, willingly admits it owes to HeiTech $166,309.62 and $284,121.74. See Answer ¶¶ 37, 38, 40. However, as Defendants have repeatedly stated that FRI will file for bankruptcy, it is likely that FRI cannot pay the debts it owes to HeiTech. Accordingly, Karen and Atron Rowe used FRI to perpetrate fraud and to commit an injustice on HeiTech, by lining their pockets with FRI money that was rightfully owed to HeiTech. Because FRI was Karen and Atron Rowe's alter ego, FRI, was used as their personal bank account, they were using the corporate form improperly. To allow this corporation to shield Karen and Atron Rowe would be improper, and this Court should pierce the corporate veil and hold Karen and Atron Rowe personally liable for any judgment entered against FRI.

## V.    CONCLUSION

WHEREFORE, the foregoing considered, Plaintiff HeiTech Services, Inc. respectfully requests that the Court grant its Motion for Summary Judgment and grant such other and further relief as may be appropriate under the circumstances of the case.

Respectfully submitted,

Dated: November 21, 2014                    HEITECH SERVICES, INC.

By Counsel

/s Brian F. Wilbourn
Brian F. Wilbourn (VSB No. 77463)
Paul W. Mengel III (VSB No. 29839)
Alexander O. Levine (Admitted *Pro Hac Vice*)
PilieroMazza PLLC
888 17th Street, NW
11th Floor
Washington, DC  20006
Phone:  (202) 857-1000
Fax:      (202) 857-0200
bwilbourn@pilieromazza.com
pmengel@pilieromazza.com
alevine@pilieromazza.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2014, a true copy of the foregoing was served by

U.S. Mail to the parties identified below.  Courtesy copies have also been provided via e-mail.

Karen Rowe
13321 Balmoral Heights Place
Clifton, VA 20124
krowe@frontroweinc.com

Atron Rowe
12025 New Dominion Parkway, Number 212
Reston, Virginia 20190
arowe@frontroweinc.com

Front Rowe, Inc.
13321 Balmoral Heights Place
Clifton, VA 20124
krowe@frontroweinc.com
arowe@frontroweinc.com

Front Rowe, Inc.
Attn: Horace McClerklin (Registered Agent)
1940 Duke Street, Suite 200
Alexandria, Virginia 22314
(*Via U.S. Mail only*)

/s Brian F. Wilbourn
Brian F. Wilbourn